# EXHIBIT 1

STATE OF MINNESOTA

MORRISON COUNTY

DISTRICT COURT

SEVENTH JUDICIAL DISTRICT

Case Type:  Other Civil

| | |
|---|---|
| TRACILEE CHURLIK, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>GATE CITY BANK,<br><br>Defendant. | Civil No. _____ |

## CLASS ACTION COMPLAINT

Plaintiff Tracilee Churlik ("Plaintiff"), individually and on behalf of the Classes of persons preliminarily defined below (the "Classes"), makes the following allegations based upon information and belief, except as to allegations specifically pertaining to Plaintiff, which are based on personal knowledge.

### NATURE OF THE ACTION

1.     Plaintiff brings this action individually and on behalf of Classes of all similarly situated consumers against Defendant Gate City Bank ("Defendant"), arising from its routine practices of assessing (i) $32 Overdraft Fees ("OD Fees") on debit card transactions authorized on sufficient funds and (ii) $32 fees on phantom transactions.

2.     Defendant breaches its customer contract, attached hereto as **Ex. A** (the "Agreement"), **Ex. B** (the "Opt In") and **Ex. C** (the "Fee Schedule") and misleadingly and deceptively misrepresents its fee practices.

1

Filed in District Court
State of Minnesota
2/8/2023 3:13 PM

3.    This is a civil action seeking monetary damages, restitution, and declaratory and injunctive relief.

4.    As described herein, Defendant's practices violate the Contract. These practices also unjustly enrich Defendant at its account holders' expense and violate the Consumer Fraud Act, M.S.A. § 325F.68 *et seq*.

5.    Defendant's improper scheme to extract funds from account holders has victimized Plaintiff and hundreds of other similarly situated consumers. Unless enjoined, Defendant will continue to engage in these schemes and will continue to cause substantial injury to its consumers.

## PARTIES

6.    Plaintiff is a citizen of Minnesota and resident of Motley, Morrison County, MN. Plaintiff has had a checking account with Defendant at all times relevant hereto.

7.    Defendant Gate City Bank is a bank with its principal place of business in Fargo, ND. It has more than $3.1 billion in assets.

## JURISDICTION AND VENUE

8.    This Court has jurisdiction over this matter because Defendant is at home in this state.

9.    Defendant regularly and systematically conducts business and provides retail banking services in this state, including to Plaintiff and members of the putative Class. As such, it is subject to the jurisdiction of this Court.

10.     Venue is proper in this County pursuant to M.S.A. §§ 542.01 and 542.09 because Defendant does business in this County and the cause of action arose in this County.

## BACKGROUND FACTS

11.     Overdraft fees and insufficient funds fees ("NSF fees") are among the primary fee generators for banks.  According to a banking industry market research company, Moebs Services, in 2018 alone, banks generated an estimated $34.5 billion from overdraft fees. *Overdraft Revenue Inches Up in 2018*, https://bit.ly/3cbHNKV.

12.     Unfortunately, the customers who are assessed these fees are the most vulnerable customers. Younger, lower-income, and non-white account holders are among those who were more likely to be assessed overdraft fees. Overdrawn: Consumer Experiences with Overdraft, Pew Charitable Trusts 8 (June 2014), https://bit.ly/3ksKD0I.

13.     Because of this, industry leaders like Bank of America, Capital One, Wells Fargo, Alliant, and Ally have made plans to end the assessment of OD or NSF fees entirely. *See* Hugh Son, *Capital One to Drop Overdraft Fees for All Retail Banking Customers*, NBC News (Dec. 1, 2021), https://nbcnews.to/3DKSu2R; Paul R. La Monica, *Wells Fargo Ends Bounced Check Fees*, CNN (Jan. 12, 2022), https://bit.ly/3iTAN9k.

14.     In addition, the CFPB recently found that Regions Bank "acted unfairly and abusively" in violation of the Consumer Financial Protection Act of 2010 by assessing assessment of OD Fees on debit card transactions previously authorized on sufficient funds –the    same    fees    that    Plaintiff    challenges    here. *See* https://www.consumerfinance.gov/enforcement/actions/regions-bank_2022/.

3

15.    In line with this industry trend, the New York Attorney General recently asked other industry leading banks to end the assessment of all OD Fees by the summer of 2022. *NY Attorney General asks banks to end overdraft fees*, Elizabeth Dilts Marshall, Reuters (April 6, 2022).

16.    In addition, the New York Department of Financial Services recently issued guidance stating in no uncertain terms that it expects institutions who charge overdraft fees on debit card transactions authorized on sufficient funds to "discontinue the practice." *See* Industry Letter:  Avoiding Improper Practices Related to Overdraft and Non-Sufficient Funds      Fees      (Jul.      12,      2022),      *available      at* https://www.dfs.ny.gov/industry_guidance/industry_letters/il20220712_overdraft_nsf_fee.

17.    Through the imposition of these fees, Defendant has made substantial revenue to the tune of tens of millions of dollars, seeking to turn its customers' financial struggles into revenue.

## I. DEFENDANT ASSESSES OVERDRAFT FEES ON DEBIT CARD TRANSACTIONS THAT WERE AUTHORIZED ON SUFFICIENT FUNDS

### A. **The Contract**

18.    At all times material hereto, Plaintiff had a checking account governed by the Contract.

19.    The Contract is a standardized form contracts for deposit accounts, the material terms of which are drafted by Defendant, amended by Defendant from time to

4894-4629-2815, v. 1

time at its convenience and complete discretion, and imposed by Defendant on all of its deposit account customers.

**B. Overview of the Claim**

20.     Plaintiff brings this action challenging Defendant's practice of charging OD Fees on what are referred to in this Complaint as "Authorize Positive, Settle Negative Transactions," or "APSN Transactions."

21.     Here's how the practice works. At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, Defendant immediately reduces consumers' checking accounts for the amount of the purchase, sets aside funds in the checking account to cover that transaction, and adjusts the consumer's displayed "available balance" to reflect that subtracted amount. As a result, customers' accounts will always have sufficient funds available to cover these transactions because Defendant has already held the funds for payment.

22.     However, Defendant still assesses crippling $32 OD Fees on many of these transactions and misrepresents its practices in the Contract.

23.     Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, Defendant later assesses OD Fees on those same transactions when they settle days later into a negative balance. These types of transactions are APSN Transactions.

24.     Defendant maintains a running account balance, tracking funds consumers have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes

a purchase with a debit card, Defendant holds the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds are not available for any other use by the accountholder and are specifically reserved for a given debit card transaction.

25.    Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498 (Jan. 29, 2009).

26.    That means when any subsequent, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for pending debit card transactions. Therefore, many subsequent transactions incur OD Fees due to the unavailability of the funds held for earlier debit card transactions.

27.    Still, despite always reserving sufficient available funds to cover the transactions and keeping the held funds off-limits for other transactions, Defendant improperly charges OD Fees on APSN Transactions.

28.    The Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

6

[A] financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.

At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, "Supervisory Highlights" (Winter 2015).

29.     There is no justification for these practices, other than to maximize Defendant's OD Fee revenue. APSN Transactions only exist because intervening transactions supposedly reduce an account balance. But Defendant is free to protect its

Filed in District Court
State of Minnesota
2/8/2023 3:13 PM

interests and either reject those intervening transactions or charge OD Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year.

30.      But Defendant was not content with these millions in OD Fees. Instead, it sought millions more in OD Fees on APSN Transactions.

31.      Besides being deceptive, these practices breach contract promises made in Defendant's adhesion contracts, which fundamentally misconstrue and mislead consumers about the true nature of Defendant's processes and practices. Defendant also exploits its contractual discretion by implementing these practices to gouge its customers.

### C. Mechanics of a Debit Card Transaction

32.      A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from Defendant. When a customer physically or virtually "swipes" their debit card, the credit card terminal connects, via an intermediary, to Defendant, which verifies that the customer's account is valid and that sufficient available funds exist to cover the transaction amount.

33.      At this step, if the transaction is approved, Defendant immediately decrements the funds in a consumer's account and holds funds in the amount of the transaction but does not yet transfer the funds to the merchant.

34.      Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

35.      Defendant (like all banks and credit unions) decides whether to "pay" debit card transactions at authorization. For debit card transactions, that moment of decision can only occur at the point of sale, when the transaction is authorized or declined. It is at that

point—and only that point—that Defendant may choose to either pay the transaction or to decline it. When the time comes to actually transfer funds for the transaction to the merchant, it is too late for the bank to deny payment—the bank has no discretion and must pay the charge. This "must pay" rule applies industry wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity. See Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

36.    There is no change—no impact whatsoever—to the available funds in an account when the transfer step occurs.

### D. Defendant's Contract

37.    The Contract states that:

> An <u>overdraft</u> occurs when there is not enough money in your account to cover a transaction, but we pay it anyway.

Ex. B at 1 (emphasis in original).

38.    The Contract also states that:

> You understand that we may, at our discretion, honor withdrawal requests that overdraw your account.

Ex. A at 4.

39.    In breach of this promise, Defendant assesses $32 OD Fees when there is "enough money…to cover" or "honor" the transaction or withdrawal request.

40.    Defendant further promises in the Contract that it will reduce the balance by the authorized amount at the moment a transaction is authorized and hold those funds for settlement of that transaction:

49-CV-23-168

CASE 0:23-cv-00637-WMW-LIB    Doc. 1-1    Filed 03/15/23    Page 11 of 32    Filed in District Court
State of Minnesota
2/8/2023 3:13 PM

A Temporary Debit Authorization Hold Affects Your Account Balance. On debit card purchases, merchants may request a temporary hold on your account for a specified sum of money, which may be more than the actual amount of your purchase. When this happens, our processing system cannot determine that the amount of the hold exceeds the actual amount of your purchase. This temporary hold, and the amount charged to your account, will eventually be adjusted to the actual amount of your purchase, but it may be up to three days before the adjustment is made. Until the adjustment is made, the amount of funds in your account available for other transactions will be reduced by the amount of the temporary hold. If another transaction is presented for payment in an amount greater than the funds left after the deduction of the temporary hold amount, that transaction will be a nonsufficient funds (NSF) transaction if we do not pay it or an overdraft transaction if we do pay it. You will be charged an NSF or overdraft fee according to our NSF or overdraft fee policy. You will be charged the fee even if you would have had sufficient funds in your account if the amount of the hold had been equal to the amount of your purchase.

Ex. A at 3.

41.     Upon information and belief, Defendant also promises that authorization and payment of a debit card transaction occur simultaneously and that overdrafts will be determined at the time a transaction is "authorized and paid":

We do *authorize and pay* overdrafts for the following types of transactions:
- Checks and other transactions made using your checking account number
- Automatic bill payments.

We do not *authorize and pay* overdrafts for the following types of transactions unless you ask us to (see below):
- ATM transactions
- Everyday debit card transactions.

10

4894-4629-2815, v. 1

> We pay overdrafts at our discretion, which means we do not guarantee
> that we will always ***authorize and pay*** any type of transaction.
>
> If we do not ***authorize and pay*** an overdraft, your transaction will be
> declined.
> …
> What if I want [the credit union] to ***authorize and pay*** overdrafts on
> my ATM and everyday debit card transactions?
>
> If you also want us to ***authorize and pay*** overdrafts on ATM and
> everyday debit card transactions, call…
> …
>
> __ I do not want [the credit union] to ***authorize and pay*** overdrafts on
> my ATM and everyday debit card transactions.
>
> __ I want [the credit union] to ***authorize and pay*** overdrafts on my
> ATM and everyday debit card transactions.

Ex. B at 1 (emphasis added, removed from original).

42.     These promises link payment to authorization ***eight*** times in the account

documents, meaning that transactions are paid, and therefore overdrafts are determined, at

authorization of a debit card transaction.

43.     For APSN Transactions, which are immediately deducted from a positive

account balance and held aside for payment of that same transaction, there is always

enough money to cover or "authorize and pay" the transaction—yet Defendant assesses

OD Fees on them anyway.

44.     In fact, Defendant actually authorizes transactions on positive funds, sets

those funds aside on hold, then fails to use those same funds to post those same transactions.

Instead, it uses a secret posting process described below.

11

45.     All of the above representations and contractual promises are untrue. Defendant charges fees even when sufficient funds exist to cover transactions that are authorized into a positive balance. No express language in any document states that Defendant may impose fees on any APSN Transactions.

46.     First, and most fundamentally, Defendant charges OD Fees on debit card transactions for which there are sufficient funds available to cover throughout their lifecycle.

47.     Defendant's practice of charging OD Fees even when sufficient available funds exist to cover a transaction violates its contractual promise not to do so. This discrepancy between Defendant's actual practice and the Contract causes consumers like Plaintiff to incur more OD Fees than they should.

48.     Next, sufficient funds for APSN Transactions are actually debited from the account immediately, consistent with standard industry practice.

49.     Because these withdrawals take place upon initiation, the funds cannot be re-debited later. But that is what Defendant does when it re-debits the account during a secret batch posting process.

50.     Defendant's actual practice is to assay the same debit card transaction twice to determine if it overdraws an account—both at the time a transaction of authorization and later at the time of settlement.

51.     At the time of settlement, however, an available balance does not change at all for these transactions previously authorized into positive funds. As such, Defendant

49-CV-23-168

Filed in District Court
State of Minnesota
2/8/2023 3:13 PM

cannot then charge an OD Fee on that transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

52.     Upon information and belief, something more is going on: at the moment a debit card transaction is getting ready to settle, Defendant releases the hold placed on funds for the transaction for a split second, putting money back into the account, then re-debits the same transaction a second time.

53.     This secret step allows Defendant to charge OD Fees on transactions that never should have gotten them—transactions that were authorized into sufficient funds, and for which Defendant specifically set aside money to pay.

54.     In sum, there is a huge gap between Defendant's practices as described in the Contract and Defendant's actual practices.

55.     Banks and credit unions like Defendant that employ this abusive practice require their accountholders to expressly agree to it—something Defendant here never did.

56.     Indeed, recognizing the complexity of the settlement process for APSN Transactions and the fact that a fee in such circumstances is counterintuitive to accountholders, other banks and credit unions require their accountholders to agree to be assessed OD Fees on APSN Transactions.

## E. Reasonable Consumers Understand Debit Card Transactions Are Debited Immediately

57.     Defendant's assessment of OD Fees on transactions that have not overdrawn an account is inconsistent with immediate withdrawal of funds for debit card transactions. This is because if funds are immediately debited, they cannot be depleted by intervening,

13

subsequent transactions. If funds are immediately debited, they are necessarily applied to the debit card transactions for which they are debited.

58.    Defendant was and is aware that this is precisely how its accountholders reasonably understand debit card transactions work.

59.    Defendant knows that consumers prefer debit cards for these very reasons. Consumer research shows that consumers prefer debit cards as budgeting devices because they don't allow debt like credit cards as the money comes directly out of the checking account.

60.    Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear." *What Do I Need To Know About Using A Debit Card?*, Consumer Action (Jan. 14, 2019), https://bit.ly/3v5YL62.

61.    This understanding is a large part of the reason that debit cards have risen in popularity. The number of terminals that accept debit cards in the United States has increased by approximately 1.4 million in the last five years, and with that increasing ubiquity, consumers have viewed debit cards (along with credit cards) "as a more convenient option than refilling their wallets with cash from an ATM." Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases*, MarketWatch (Mar. 23, 2016), https://on.mktw.net/3kV2zCH.

4894-4629-2815. v. 1

49-CV-23-168

CASE 0:23-cv-00637-WMW-LIB    Doc. 1-1    Filed 03/15/23    Page 16 of 32    Filed in District Court
State of Minnesota
2/8/2023 3:13 PM

62.    Not only have consumers increasingly substituted debit cards for cash, but they believe that a debit card purchase is the functional equivalent to a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

63.    Accordingly, "[o]ne of the most salient themes [in complaints to the CFPB] . . . is the difficulty avoiding overdrafts even when consumers believed they would. Often, this was related to bank practices that make it difficult for consumers to know balance availability, transaction timing, or whether or not overdraft transactions would be paid or declined." Rebecca Borne et al., *Broken Banking: How OD Fees Harm Consumers and Discourage Responsible Bank Products*, Center for Responsible Lending 8 (May 2016), https://bit.ly/3v7SvL1.

64.    In fact, consumers' leading complaints involved extensive confusion over the available balance and the time of posting debits and credits:



Figure 3: Top Overdraft Consumer Complaint Issues, by Percentage of Total Complaints

*Id.*

15

Filed in District Court
State of Minnesota
2/8/2023 3:13 PM

65.     Consumers are particularly confused by financial institutions' fee practices when "based on their actual review of their available balance, often including any 'pending' transactions, [customers] believed funds were available for transactions they made, but they later learned the transactions had triggered overdraft fees." *Id.* at 9.

66.     Ultimately, unclear and misleading fee representations like those in Defendant's account documents mean that consumers like Plaintiff "who are carefully trying to avoid overdraft, and often believe they will avoid it . . . end up being hit by fees nonetheless." Id.

67.     The Federal Deposit Insurance Corporation ("FDIC") has specifically noted that financial institutions may effectively mitigate this wide-spread confusion regarding overdraft practices by "ensuring that any transaction authorized against a positive available balance does not incur an overdraft fee, even if the transaction later settles against a negative available balance." *Consumer Compliance Supervisory Highlights*, FDIC 3 (June 2019),https://bit.ly/3t2ybsY.

68.     Despite this recommendation, Defendant continues to assess OD Fees on transactions that are authorized on sufficient funds.

69.     Defendant was aware of the consumer perception that debit card transactions reduce an account balance at a specified time—namely, the time and order the transactions are actually initiated—and the Contract only supports this perception.

70.     Defendant was also aware of consumers' confusion regarding OD Fees but nevertheless failed to make its members agree to these practices.

4894-4629-2815, v. 1

### F. Plaintiff Was Assessed OD Fees on Debit Card Transactions Previously Authorized on Sufficient Funds

71.     On or around June 18, 2019, July 3, 2019, August 1, 2019, August 31, 2019, September 13, 2019, September 14, 2019, September 28, 2019, Plaintiff was assessed $32 OD Fees on a debit card transactions that settled that day, even though the transactions had been previously authorized on sufficient funds.

72.     Because Defendant had previously held the funds to cover these transactions, Plaintiff's account always had sufficient funds to cover these transactions and should not have been assessed these fees.

## II. DEFENDANT CHARGES OD FEES ON PHANTOM TRANSACTIONS

### A. Overview of Claim

73.     Plaintiff brings this action challenging Defendant's practice of charging fees on phantom transactions—where accountholders never perform a debit or transaction, and where the account balance is never actually overdrawn.

74.     Several apps and websites, including in this instance PayPal, use a verification process to confirm the validity of a user's bank account so that the user can then seamlessly send and receive payments.

75.     As part of the process of verifying a user's bank account, these entities will deposit and immediately withdraw a tiny amount, usually between one cent and nine cents. This deposit and withdrawal process occurs virtually simultaneously and is designed solely to ensure the account is valid and the entity can communicate with the account.

76.   No actual purchase or payment is involved in what is essentially a "test" transaction, and there is no change to the account balance.

77.   The bank account linking and verification process is instantaneous. Yet Defendant split this instantaneous process in order to increase fees it could charge on accounts.

78.   A bank like Defendant is notified and aware of this routine practice, just as it is aware and notified that an accountholder has made no purchase, debit, or transaction when third parties verify a consumer's account with this method.

**B. Plaintiff's Experience**

79.   On or around August 21, 2019, PayPal put this verification process into motion, with the sole and exclusive intent to verify that Plaintiff's account was valid and active. To do this, PayPal made two deposits totaling $0.28 and then immediately removed that $0.28. No purchase or transaction was made by Plaintiff, and no change to her account balance occurred.

80.   Nonetheless, Defendant charged Plaintiff a $32 fee when it debited the $0.28 that had been deposited just moments earlier—a fee amount nearly 115 times larger than the $0.28 cents for which it purported to charge a fee.

81.   This fee assessment violated the Contract.

**C. Defendant's Account Contract**

82.   The Contract states:

> You understand that we may, at our discretion, honor withdrawal requests that overdraw the account.

Ex. A at 2.

4894-4629-2815, v. 1

83.    But the verification process is not a "withdrawal request," and, because the $0.28 required to complete the verification process is placed in the account before it is deducted, the account is never overdrawn.

84.    Further, the Fee Schedule states:

| | Deposit Account Fees |
|---|---|
| … | |
| **NSF Fee** This fee is imposed when a NSF condition is created by check, in-person withdrawal, ATM withdrawal, or other electronic means. | $32/item |

Ex. B.

85.    The verification process is not an "item," as that term is used in the Contract and associated documents.

86.    "Item" in ordinary use is a "single article or unit in a collection, enumeration, or series." Item, American Heritage Dictionary (5th ed. 2020). An "item" is an instruction by an account holder to make payments from the account.

87.    An "item," in its trade usage, is a "negotiable instrument or a promise or order to pay money handled by a bank for collection or payment." Item, Black's Law Dictionary (11th ed. 2019); *see also* Ohio Rev. Code Ann. § 1304.01(A)(9) (defining "item" as "an instrument, promise or order to pay money handled by a bank for collection or payment"). The term thus again means an order by the account holder to pay—not a verification process.

88.    Accordingly, Defendant breached its contractual promises when it charged fees on the one penny verification process.

## III.    <u>NONE OF THESE FEES WERE ERRORS.</u>

4894-4629-2815, v. 1

49-CV-23-168

Filed in District Court
State of Minnesota
2/8/2023 3:13 PM

89.     The improper fees charged by Defendant to Plaintiff's account were not errors by Defendant, but rather were intentional charges made by Defendant as part of its standard processing of transactions.

90.     Plaintiff therefore had no duty to report the fees as errors because they were not; instead, they were part of the systematic and intentional assessment of fees according to Defendant's standard practices.

91.     Moreover, any such reporting would have been futile as Defendant's own contract admits that Defendant made a decision to charge the fees.

## IV.   THE IMPOSITION OF THESE IMPROPER FEES BREACHES DEFENDANT'S DUTY OF GOOD FAITH AND FAIR DEALING

92.     Parties to a contract are required not only to adhere to the express conditions of the contract but also to act in good faith when they are invested with a discretionary power over the other party. This creates an implied duty to act in accordance with accountholders' reasonable expectations and means that the bank or credit union is prohibited from exercising its discretion to enrich itself and gouge its customers. Indeed, the bank or credit union has a duty to honor transaction requests in a way that is fair to its customers and is prohibited from exercising its discretion to pile on even greater penalties on its accountholders.

93.     Here—in the adhesion agreements Defendant foisted on Plaintiff and its other customers—Defendant has provided itself numerous discretionary powers affecting customers' accounts. But instead of exercising that discretion in good faith and consistent with consumers' reasonable expectations, Defendant abuses that discretion to take money

4894-4629-2815, v. 1

49-CV-23-168

CASE 0:23-cv-00637-WMW-LIB    Doc. 1-1    Filed 03/15/23    Page 22 of 32    Filed in District Court
State of Minnesota
2/8/2023 3:13 PM

out of consumers' accounts without their permission and contrary to their reasonable expectations that they will not be charged improper fees.

94.    Defendant abuses its discretion in its own favor—and to the prejudice of Plaintiff and its other customers—when it assesses fees in this manner. By always assessing these fees to the prejudice of Plaintiff and other customers, Defendant breaches their reasonable expectations and, in doing so, violates its duty to act in good faith. This is a breach of Defendant's implied covenant to engage in fair dealing and to act in good faith.

95.    It was bad faith and totally outside Plaintiff's reasonable expectations for Defendant to use its discretion in this way.

96.    When Defendant charges improper fees in this way, Defendant uses its discretion to interpret the meaning of key terms in an unreasonable way that violates common sense and reasonable consumers' expectations. Defendant uses its contractual discretion to set the meaning of those terms to choose a meaning that directly causes more fees.

## CLASS ACTION ALLEGATIONS

97.    Plaintiff incorporates by reference the preceding paragraphs.

98.    *Description of the Class*: Plaintiff brings this action individually and on behalf of the following Classes of persons:

> All citizens of Minnesota who, during the applicable statute of limitations, were checking accountholders of Defendant and were assessed an overdraft fee on a debit card transaction that was authorized on sufficient funds and settled on negative funds in the same amount for which the debit card transaction was authorized (the "APSN Class").

> All citizens of Minnesota who hold a Defendant checking account and who, within the applicable statute of limitations, were charged fees as a result of a verification process on their accounts that resulted in no change to their account balances (the "Verify Bank Class").

99.    Excluded from the Class are Defendant's officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns. Also excluded from the Class are any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

100.    Plaintiff reserves the right to modify or amend the definition of the proposed Class if necessary before this Court determines whether certification is appropriate.

101.    The time period for the Class is the number of years immediately preceding the date on which this Complaint was filed as allowed by the applicable statute of limitations, going forward into the future until such time as Defendant remedies the conduct complained of herein.

102.    *Numerosity*: The members of the proposed Class are so numerous that individual joinder of all members is impracticable. The exact number and identities of the members of the proposed Class are unknown at this time and can be ascertained only through appropriate discovery. Plaintiff estimates the number of members in the Class to be in the thousands.

103.    *Commonality and Predominance*: There are many questions of law and fact common to Plaintiff and the Class, and those questions substantially predominate over any questions that may affect individual Class members. Common questions of law and fact include:

a.  Whether Defendant charged OD Fees on APSN Transactions and phantom transactions;

b.  Whether these practices breach the Contract;

c.  Whether Defendant was unjustly enriched by the fee practices as alleged herein;

d.  Whether Defendant violated the Consumer Fraud Act;

e.  The proper method or methods by which to measure damages; and

f.  The declaratory and injunctive relief to which the Class are entitled.

104.    *Typicality:* Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class have been similarly affected by Defendant's actions.

105.    *Adequacy of Representation*: Plaintiff will fairly and adequately represent and protect the interests of the Class. There is no hostility of interest between Plaintiff and the unnamed Class members. Plaintiff has retained counsel with substantial experience in prosecuting complex and consumer class action litigation. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so.

106.    *Superiority of Class Action*: Plaintiff and the members of the Class suffered, and will continue to suffer, harm as a result of Defendant's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the present controversy. Individual joinder of all members of the Class is impractical. Even if individual Class members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed.

4894-4629-2815, v. 1

Individual litigation magnifies the delay and expense to all parties in the court system of resolving the controversies engendered by Defendant's common course of conduct. The class action device allows for unitary adjudication, judicial economy, and the fair and equitable handling of all class members' claims in a single forum. The conduct of this action as a class action conserves the resources of the parties and of the judicial system and protects the rights of the Class members.

107.    *Risk of Inconsistent or Varying Adjudication*: Class action treatment is proper, and this action should be maintained as a class action because the risks of separate actions by individual members of the Class would create a risk of: (a) inconsistent or varying adjudications with respect to individual Class members which would establish incompatible standards of conduct for Defendant as the party opposing the Class; and/or (b) adjudications with respect to individual Class members would, as a practical matter, be dispositive of the interests of other Class members not party to the adjudication or would substantially impair or impede their ability to protect their interests.

108.    *Action Generally Applicable to Class as a Whole*: Defendant, as the party opposing the Class, has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to each Class as a whole.

**FIRST CLAIM FOR RELIEF**
**Breach of Contract, Including Breach of the Covenant of Good Faith and Fair Dealing**
**(On Behalf of Plaintiff and the APSN Class)**

4894-4629-2815, v. 1

49-CV-23-168

CASE 0:23-cv-00637-WMW-LIB    Doc. 1-1    Filed 03/15/23    Page 26 of 32    Filed in District Court
State of Minnesota
2/8/2023 3:13 PM

109. Plaintiff realleges and incorporates by reference all the foregoing allegations as if they were fully set forth herein.

110. Plaintiff and Defendant have contracted for bank account services, as embodied in the Contract. Exs. A-C.

111. All contracts entered by Plaintiff and the APSN Class are identical or substantively identical because Defendant's form contracts were used uniformly.

112. Defendant has breached the express terms of its own agreements as described herein.

113. Under Minnesota law, good faith is an element of every contract between financial institutions and their customers because banks and credit unions are inherently in a superior position to their checking accountholders and, from this superior vantage point, they offer customers contracts of adhesion, often with terms not readily discernible to a layperson.

114. Good faith and fair dealing means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

115. Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of the spirit of the bargain and abuse of a power to specify terms.

4894-4629-2815, v. 1

49-CV-23-168

CASE 0:23-cv-00637-WMW-LIB   Doc. 1-1   Filed 03/15/23   Page 27 of 32   Filed in District Court
State of Minnesota
2/8/2023 3:13 PM

116.   Defendant abused the discretion it granted to itself when it charged fees on transactions that did not overdraw an account.

117.   Defendant also abused the discretion it granted to itself by defining key terms in a manner that is contrary to reasonable accountholders' expectations.

118.   In these and other ways, Defendant violated its duty of good faith and fair dealing.

119.   Defendant willfully engaged in the foregoing conduct for the purpose of (1) gaining unwarranted contractual and legal advantages; and (2) unfairly and unconscionably maximizing fee revenue from Plaintiff and other members of the APSN Class.

120.   Plaintiff and members of the APSN Class have performed all, or substantially all, of the obligations imposed on them under the Contract.

121.   Plaintiff and members of the APSN Class have sustained damages as a result of Defendant's breaches of contract, including breaches of contract through violations of the covenant of good faith and fair dealing.

122.   Plaintiff and the members of the APSN Class are entitled to injunctive relief to prevent Defendant from continuing to engage in the foregoing conduct.

**SECOND CLAIM FOR RELIEF**
**Breach of Contract, Including Breach of the Covenant of Good Faith and Fair Dealing**
**(On Behalf of Plaintiff and the Verify Bank Class)**

123.   Plaintiff realleges and incorporates by reference all the foregoing allegations as if they were fully set forth herein.

49-CV-23-168

Filed in District Court
State of Minnesota
2/8/2023 3:13 PM

124.    Plaintiff and Defendant have contracted for bank account services, as embodied in the Contract. Exs. A-C.

125.    All contracts entered by Plaintiff and the Verify Bank Class are identical or substantively identical because Defendant's form contracts were used uniformly.

126.    Defendant has breached the express terms of its own agreements as described herein.

127.    Under Minnesota law, good faith is an element of every contract between financial institutions and their customers because banks and credit unions are inherently in a superior position to their checking account holders and, from this superior vantage point, they offer customers contracts of adhesion, often with terms not readily discernible to a layperson.

128.    Good faith and fair dealing means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

129.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of the spirit of the bargain and abuse of a power to specify terms.

130.    Defendant abused the discretion it granted to itself when it assessed fees as part of a third-party account verification process.

131.    Defendant also abused the discretion it granted to itself by defining key terms in a manner that is contrary to reasonable account holders' expectations.

132.    In these and other ways, Defendant violated its duty of good faith and fair dealing.

133.    Defendant willfully engaged in the foregoing conduct for the purpose of (1) gaining unwarranted contractual and legal advantages; and (2) unfairly and unconscionably maximizing fee revenue from Plaintiff and other members of the Verify Bank Class.

134.    Plaintiff and members of the Verify Bank Class have performed all, or substantially all, of the obligations imposed on them under the agreements.

135.    Plaintiff and members of the Verify Bank Class have sustained damages as a result of Defendant's breaches of contract, including breaches of contract through violations of the covenant of good faith and fair dealing.

136.    Plaintiff and the members of the Unauthorized Fee Class are entitled to injunctive relief to prevent Defendant from continuing to engage in the foregoing conduct.

### THIRD CLAIM FOR RELIEF
### Unjust Enrichment
### (On Behalf of Plaintiff and the Classes)

137.    Plaintiff incorporates by reference the preceding paragraphs.

138.    Plaintiff, individually and on behalf of the Classes, asserts a common law claim for unjust enrichment. This claim is brought solely in the alternative to Plaintiff's breach of contract claim and applies only if the parties' contract is deemed unconscionable or otherwise unenforceable for any reason. In such circumstances, unjust enrichment will dictate that Defendant disgorge all improperly assessed fees.

28

139.    Plaintiff and members of the Classes conferred a benefit on Defendant at the expense of Plaintiff and members of the Classes when they paid improper fees.

140.    Defendant appreciated this benefit in the form of the substantial revenue that Defendant generates from the imposition of such fees.

141.    Defendant has accepted and retained such fees under inequitable and unjust circumstances.

142.    Defendant should not be allowed to profit or enrich itself inequitably and unjustly at the expense of Plaintiff and the members of the Classes and should be required to make restitution to Plaintiff and members of the Classes.

### FOURTH CLAIM FOR RELIEF
### (Consumer Fraud Act, M.S.A. § 325F.68 et seq.)
### (On Behalf of Plaintiff and the Classes)

143.    The Consumer Fraud Act prevents the "act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice." M.S.A. § 325F.69.

144.    Defendant is a "person" under the Consumer Fraud Act. M.S.A. § 325F.68.

145.    Defendant misrepresented its actual fee assessment practices and misled and deceived its accountholders by assessing OD Fees on APSN Transactions and OD and NSF Fees on phantom transactions.

146.    Plaintiff has been damaged by this practice and is entitled to actual damages, injunctive relief and reasonable attorneys' fees and costs. M.S.A. § 8.31(3a).

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully requests that the Court:

    a. Certify this case as a class action, designating Plaintiff as class representative and designating the undersigned as Class Counsel;

    b. Award Plaintiff and the Class actual damages in amount according to proof;

    c. Award Plaintiff and the Class restitution in an amount to be proven at trial;

    d. Award Plaintiff and the Class pre-judgment interest in the amount permitted by law;

    e. Award Plaintiff and the Class attorneys' fees and costs as permitted by law;

    f. Declare Defendant's practices outlined herein to be unlawful and a breach of contract;

    g. Enjoin Defendant from engaging in the practices outlined herein;

    h. Grant Plaintiff and the Class a trial by jury;

    i. Grant leave to amend these pleadings to conform to evidence produced at trial; and

    j. Grant such other relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff, by counsel, demands trial by jury.

Dated: February 8, 2023

*/s/ Karen Hanson Riebel*
Karen Hanson Riebel (219770)
Kate M. Baxter-Kauf (392037)
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Avenue S., Suite 2200
Minneapolis, MN 55401-2159

4894-4629-2815, v. 1

49-CV-23-168

CASE 0:23-cv-00637-WMW-LIB    Doc. 1-1    Filed 03/15/23    Page 32 of 32    Filed in District Court
State of Minnesota
2/8/2023 3:13 PM

612-339-6900
khriebel@locklaw.com
kmbaxter-kauf@locklaw.com

Lynn A. Toops*
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: 317-636-6481
Facsimile: 317-636-2593
ltoops@cohenmalad.com

Gerard Stranch, IV*
BRANSTETTER, STRANCH & JENNINGS, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
Telephone: (615) 254-8801
Facsimile: (615) 255-5419
gerards@bsjfirm.com

Christopher D. Jennings*
JOHNSON FIRM
610 President Clinton Avenue, Suite 300
Little Rock, Arkansas 72201
Telephone: (501) 372-1300
Facsimile: (888) 505-0909
chris@yourattorney.com

*Attorneys for Plaintiff and the Putative Class*

* to seek admission *pro hac vice*